# In the United States Court of Federal Claims

No. 24-1679
Filed: October 28, 2025

|   |
|---|
| **GALT AUTOMOTIVE WAREHOUSE, INC.**, et al.,<br><br>    *Plaintiffs*,<br><br>v.<br><br>**THE UNITED STATES**,<br><br>    *Defendant*. |

*Lindsay S.C. Brinton*, with *Meghan S. Largent*, *Michael Armstrong*, and *Marlee L. Rowe*, Lewis Rice, LLC, St. Louis, MO, for Plaintiffs.

*Alexis E. Smith*, Environment and Natural Resources Division, Natural Resources Section, with *Adam R.F. Gustafson*, Acting Assistant Attorney General, U.S. Department of Justice, Washington, D.C., for Defendant.

### MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

  Plaintiffs seek damages for the United States' uncompensated taking related to their New York properties. They now move for partial summary judgment as to liability. (Pls.' Mot., ECF No. 23). The United States objects in part and cross-moves for partial summary judgment. (Def.'s Mot., ECF No. 30). The United States first argues that genuine issues of material fact exist for two (2) of the four (4) properties because Plaintiffs cannot demonstrate ownership of property adjacent to and underlying the rail line; it also argues that none of the Plaintiffs can establish causation. The Court finds that genuine issues of material fact exist as to the two properties and therefore **GRANTS-IN-PART** and **DENIES-IN-PART** Plaintiffs' Motion for Partial Summary Judgment. Additionally, the United States' Cross-Motion for Partial Summary Judgment is **DENIED**.

### I.  Background

  This rails-to-trails case concerns a 41.1-mile section of rail line running from the Connecticut/New York State Line to Beacon, New York across Dutchess and Putnam Counties (the "Line"):



(Compl. ¶ 3, ECF No. 1; Pls.' Mot. at 1). In 1995, the Line was acquired by the Metro-North Commuter Railroad Company ("MNR"). (Pls.' Mot. at 1). Years later, MNR petitioned the Surface Transportation Board ("STB") for permission to abandon the Line. (*Id.* at 1–2). MNR sought to preserve the Line for use as a recreational trail through 16 U.S.C. § 1247(d) of the National Trails System Act Amendments of 1983 (the "Trails Act"). (*Id.* at 2).

Under the Trails Act, a railroad may initiate abandonment proceedings of a rail line before the STB. 49 U.S.C. § 10903; *see* 16 U.S.C. § 10502. The Trails Act permits intervention by qualified private organizations or public agencies to preserve the corridor before abandonment is consummated by agreeing to serve as a trail operator in the interim; this process is known as "railbanking." 16 U.S.C. § 1247(d). The railbanking intervention process allows a railroad to negotiate with the intervening entity, which assumes financial and managerial responsibility for the corridor by operating it as a recreational trail. 28 A.L.R. Fed. 3d Art. 6 (citing *Preseault v. ICC*, 494 U.S. 1, 6–7, (1990) ("*Preseault I*")). To allow for this process, the STB may issue a Notice of Interim Trail Use or Abandonment ("NITU"). 49 C.F.R. § 1152.29. If the railroad and trail sponsor agree, then the parties notify the STB, the corridor is railbanked, the STB retains jurisdiction, and "interim trail use is thereby authorized." *Preseault I*, 494 U.S. at 7 n.5 (1990); *see also* 16 U.S.C. § 1247(d); 49 C.F.R. § 1152.29(h). If an agreement is not reached, the railroad may exercise its STB-granted authority to abandon the line. 49 C.F.R. § 1152.29(d)(1), (e)(2); *see also Citizens Against Rails-to-Trails v. STB*, 267 F.3d 1144, 1150–53 (D.C. Cir. 2001).

In December 2023, MNR filed a Verified Notice of Exemption of Abandonment ("Abandonment Application") with the STB. (Pls.' Mot., Ex. II, ECF No. 23-35). MNR also formally requested to assume financial responsibility for the Line and requested a NITU, (*id.*, Ex. KK, ECF No. 23-37), which the STB issued on February 8, 2024, (*id.*, Ex. MM, ECF No. 23-39).

Per the NITU, MNR was required to notify STB of a trail use agreement prior to its expiration on February 8, 2025. (*Id.*, Ex. MM at 3). MNR filed for and was granted an Extension of the Interim Trail Use Negotiation Period, which is now set to expire on February 8, 2026. (Def.'s Mot. at 5 (citing Def.'s Mot. Ex. 1, ECF No. 30-1)). According to the United States, MNR is currently considering a trail use agreement, though none has been reached. (Def.'s Mot. at 6 (citing Def.'s Mot. Ex. 2 at 5, ECF No. 30-2)).[1]

## II.  Analysis

### A.  Standard of Review

The parties each move for summary judgment. The Court may "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Facts are material if they "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine factual dispute exists when "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.*

While "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), summary judgment may still be granted when the party opposing the motion submits evidence that "is merely colorable . . . or is not significantly probative." *Anderson*, 477 U.S. at 251 (internal citation omitted). However, the moving party "need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex Corp.*, 477 U.S. at 325). Courts may only grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita, Elec. Indus. Co., Ltd. v. United States*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). A trial court is permitted, in its discretion, to deny even a well-supported motion for summary judgment if it believes the case would benefit from a full hearing. *Lowery v. United States*, 167 Fed. Cl. 28, 37 (2023) (citing *United States v. Certain Real & Pers. Prop. Belonging to Hayes*, 943 F.2d 1292 (11th Cir. 1991)).

### B.  Discussion

In Trails Act cases, a taking occurs when "government action destroys state-defined property rights[,]" either "by converting a railway easement to a recreational trail, if trail use is

---

[1] Plaintiffs note that MNR has communicated its intentions of creating a public trail across the former railroad easement and operating as both owner and trail sponsor in its filings with the STB. (Pls.' Mot. at 2–3). MNR recently stated that it is negotiating with the State of New York to have the State operate as a trail sponsor for the trail. (*Id.* at 3).

outside the scope of the original railway easement[,]" or by compelling the continuation of an easement for railroad purposes to accommodate negotiations for a trail-use agreement, even if the negotiations are ultimately unsuccessful. *See Ladd v. United States*, 630 F.3d 1015, 1019, 1025 (Fed. Cir. 2010); *see also Caquelin v. United States*, 959 F.3d 1360, 1367 (Fed. Cir. 2020).

The key questions for determining takings liability are: (1) whether the railroad acquired full ownership of the land (fee simple) or merely easements; (2) if only easements were acquired, whether those easements were limited to railroad use or also permitted future use as public recreational trails; and (3) whether any such easement permitting recreational trail use expired before the alleged taking, leaving the landowners with full, unencumbered ownership at that time. *See Preseault v. ICC*, 100 F.3d 1525, 1550 (Fed. Cir. 1996) ("*Preseault II*") (en banc) (plurality opinion); *see also Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009). Importantly, property rights are determined by state law. *Castillo v. Diaz*, 952 F.3d 1311, 1319 (Fed. Cir. 2020). This analysis becomes more complicated when a trail use agreement has not been reached. The Federal Circuit has held that in cases where no trail-use agreement is reached, but the NITU compels the railroad to delay its abandonment, the issuance of a NITU may effect a temporary physical taking. *Ladd*, 630 F.3d at 1023–24. To show causation when no trail use agreement exists, it must be clear that the railroad "had every intent to abandon the railroad lines during the period of time that the NITU was in effect and was prevented from doing so by the existence of the NITU." *Memmer v. United States*, 50 F.4th 136, 145 (Fed. Cir. 2022).

Plaintiffs filed their Motion for Partial Summary Judgment on Liability requesting the Court resolve three questions in their favor—whether: (1) Plaintiffs owned their property adjacent to and underlying the Line on February 8, 2024; (2) the United States is liable for taking Plaintiffs' property without providing just compensation; and (3) the United States is liable to Plaintiffs regardless of whether the STB has yet been notified of a trail use agreement. (Pls.' Mot. at 4). The United States does not dispute Plaintiffs' ownership of real property at the addresses illustrated below:

| Plaintiff | Address |
|---|---|
| Galt Automotive Warehouse, Inc. | 3874 Danbury Road, Brewster, NY 10509 |
| John Kelly and Zoe Markwalter-Kelly | 590 Main Street, Beacon, NY 12508 |
| Bernhard R. Liegl and Irene Popova | 576 Washington Ave, Beacon, NY 12508 |
| Spanish Pentecostal Church, The Tabernacle of Christ, Beacon, NY, Inc | 483 Main Street, Beacon NY 12508 |

(Def.'s Mot. at 9; *see also* Pls.' Mot. at 13). However, the United States challenges whether all of the properties at issue can properly invoke the centerline presumption to establish a title interest in the railroad corridor. (Def.'s Mot. at 9). Specifically, the United States challenges the title claims asserted by Plaintiffs John Kelly and Zoe Markwalter-Kelly ("the Kelly Plaintiffs"), as well as by the Spanish Pentecostal Church, The Tabernacles of Christ Beacon NY, Inc. ("the Church"). (*Id.* at 10). As to Plaintiffs Bernhard R. Liegl ("Mr. Liegl") and Irene Popova ("Ms.

4

Popova"), and Galt Automotive Warehouse, Inc. ("Galt"), the United States does not contest that these Plaintiffs own land adjacent to a segment of the railroad corridor acquired as an easement. (*Id.* at 11). However, it continues to dispute liability with respect to all four properties. The Court examines each area of dispute in turn.

  i. Causation

Because no trail use agreement has been reached, MNR's intent to abandon is pivotal to causation. The United States argues the Plaintiffs fail to demonstrate that MNR would have consummated abandonment of the rail line during the NITU period absent the NITU and thus cannot establish liability for a taking. (Def.'s Mot. at 27–31). Furthermore, the United States contends that the Federal Circuit's recent decision in *Sauer West* resolves the causation issue in this case. (Hearing Transcript ("Hr'g Tr.") at 4:15–6:11, ECF No. 46 (citing *Sauer West LLC v. United States*, 151 F.4th 1339, 1346 (Fed. Cir. 2025)). The Court disagrees.

In *Sauer West,* the Circuit explained that determining whether plaintiffs have met their burden to establish causation requires examining the totality of the circumstances. *Sauer West LLC*, 151 F.4th at 1346. The Circuit discussed *Caquelin*, in which it found five factors were sufficient to show plaintiffs had met their burden, including: (1) the railroad requested abandonment; (2) the railroad refused to consent to an extension of the NITU; (3) the railroad abandoned the line within three months of the NITU's expiration; (4) the NITU authorized removal of tracks during the pendency of the NITU period; and (5) the railroad did in fact remove tracks. *Id.* (citing *Caquelin III*, 959 F.3d at 1373; *Memmer*, 50 F.4th at 145 (comparing different factors considered in *Caquelin* and *Memmer*)). The Circuit, however, pointed out how in *Sauer West*, the Claims Court considered factors that went beyond those listed in *Caquelin*, to include: (1) six one-year extensions to negotiate the trails agreement; (2) improvements to the Line; (3) no removal of tracks; (4) railcar storage on the line; (5) negotiations with other parties to reopen the Line, and (6) the eventual decision not to abandon. *Id.* (citing *Sauer West v. United States*, 168 Fed. Cl. 49, 68 (2023)). In S*auer West,* the trial court found that the plaintiffs had not shown the railroad would have abandoned the line, and thus failed to establish causation. *Sauer West*, 168 Fed. Cl. at 72–73. However, the Circuit's holding in *Sauer West* does not stand for the narrow proposition the United States advocates for; rather, it affirms that causation must be assessed based on the totality of the circumstances. *Sauer West*, 151 F.4th at 1346. Ultimately, the Circuit stressed that the cases discussed in no way establish a "multi-factor test[,]" but rather illustrate examples of evidence the Court may consider. *Id.*

In *Dimarino*, a case centered on the same rail line, the United States' arguments against causation at the summary judgment stage were similar to the present case. *Dimarino v. United States*, 2025 WL 2985487 (Fed. Cl. May 13, 2025). There, the United States also argued against causation premised on the fact that MNR had not consummated abandonment, but the Court explained that the purpose of the Trails Act is to "preserve the right-of-way for future use, and, in the interim, convert the corridor into a recreational trail[;]" a railroad acting in accordance with the Act's stated purpose does not preclude the Court from finding a taking occurred. *Id.* at 3 (quoting *Chicago Coating Co. LLC v. United States*, 892 F.3d 1164, 1167 (Fed. Cir. 2018) (internal citation omitted)). Stated differently, MNR's failure to consummate abandonment stems from its continued efforts to negotiate a trail use agreement, but this is a contemplated part of the railbanking process and therefore not dispositive of whether a taking has occurred.

The United States argues the Court must look to the NITU period to determine when the railroad would have abandoned, and not when the NITU issued. (Hr.'g Tr. at 13:11–20). In *Dimarino*, the Court held that the "railroad's intent at the time of the NITU is the focus of the Court's inquiry[.]" *Dimarino*, 2025 WL 2985487, at *2 (citing *Sauer West*, 168 Fed. Cl. at 63–64, *aff'd*, 151 F.4th 1339 (Fed. Cir. 2025)). The Circuit has since clarified that while "the railroad's intent at the time of the NITU's issuance is probative as to . . . whether it would have consummated abandonment in the absence of the NITU, it does not establish causation[.]" *Sauer West*, 151 F.4th at 1346. The Circuit's explanation aligns with the Court's analysis in *Dimarino*. In *Dimarino*, the railroad had also taken additional steps that informed the Court's decision. For example, MNR filed an Abandonment Application, which the Court found demonstrated an "affirmative intent to abandon[.]" *Dimarino*, 2025 WL 2985487, at *3 (quoting *Caquelin*, 959 F.3d at 1372). The Court also noted that MNR had repeatedly stated that it chose to abandon the line due to a decreased demand for freight services. *Id.* The Court explained that MNR's self-expression of its intent to abandon, and the United States' failure to rebut the presumption of abandonment, left no doubt that a taking had in fact occurred. *Id*.

This case has facts very similar to those in *Dimarino*. First, MNR has filed an Abandonment Application, reflecting its intent to abandon the rail corridor. *Caquelin*, 959 F.3d at 1360. Second, MNR has, on several occasions, stated its intent to abandon the line to pursue recreational trail use to the STB. (*See* Pls.' Mot. Exs. KK, BBB, ECF Nos. 23-37, 34-2). Third, when responding the United States' Request for Production of Documents, MNR stated that it "chose to abandon the line" due to diminished demand for freight services. (Def.'s Mot., Ex. 2 at 12, ECF No. 30-2).[2] While MNR has sought and obtained a one-year extension, the United States acknowledges that MNR has also discontinued service of the rail line. (Hr.'g Tr. at 6:18–7:10 (The Court: "It just seemed like you were sort of qualifying perhaps that, well, there's some type of service, but not another, but there's no service." Def.'s Counsel: "No service. Correct, Your Honor"). Additionally, the United States has neither argued nor produced any evidence that the rail line is being used for any purpose or undergone any sort of maintenance or improvements, despite Plaintiffs' allegations that the line has not been utilized in over twenty years. (Hr.'g Tr. at 11:13–14 (Pls.' Counsel: "They haven't used it in [twenty]-plus years. There's no traffic.")).

The Court finds that the United States has failed to present "any evidence at all affirmatively indicating the railroad would have delayed abandonment . . . had there been no NITU[.]" *Sauer West*, 151 F.4th at 1346. Plaintiffs, on the other hand, have shown that MNR would have abandoned the rail line in absence of the NITU. MNR's intent to abandon the rail line is evident from its own representations. (*See* Def.'s Mot., Ex. 2 at 12). The United States failed to rebut this presumption and failed to advance any significant argument addressing liability during the hearing. For this reason, on the element of causation, the Court rules against the United States and in favor of Plaintiffs Bernard R. Liegel, Irene Popova, and Galt Automotive Warehouse, Inc. The Motion for Summary Judgment filed by these Plaintiffs is granted as to causation. However, as discussed below, because the issue of interest remains

---

[2] The United States' Exhibit 2 contains two documents with varying page numbers, thus this citation refers to those assigned by CM/ECF.

unresolved for the Kelly and Church Plaintiffs, the Court cannot decide causation as to their claims.[3]

    ii.  <u>The Centerline Presumption</u>

The United States challenges whether the Kelly and Church Plaintiffs can properly invoke the centerline presumption to establish a title interest in the railroad corridor. (Def.'s Mot. at 9–10). The "centerline presumption" generally assumes that property owners whose land borders a railroad or road also own the land up to the centerline of that right-of-way, unless state law or the original deed shows otherwise. *Castillo*, 952 F.3d at 1311, 1314, 1320 (citing *Banks v. Ogden*, 69 U.S. 57, 68 (1864)). New York law supports this presumption, but it can be rebutted if there is evidence—such as from the deed or surrounding circumstances—that the original grantor intended to transfer land only up to the edge of the road. *Marks v. Gaeckle*, 156 N.Y.S.3d 402, 404 (N.Y. App. Div. 2021); *Bashaw v. Clark*, 699 N.Y.S.2d 533, 537 (N.Y. App. Div. 1999). Courts consider various factors, including the deed's language, land layout, and actions of past owners, to determine intent. *DiMarino v. United States*, 2025 WL 2985441, at *3 (Fed. Cl. Mar. 24, 2025) (citing *Marks*, 156 N.Y.S. at 404). When there is doubt as to intent, it can also be garnered from the practical construction of the grantor and grantee and their successors in title. *Id.* (citing *Lehrman v. Lake Katonah Club, Inc.*, 794 N.Y.S.2d 670 (N.Y. App. Div. 2005) (internal citations omitted)). Neither party disputes the application or relevance of the centerline presumption, but the United States argues that it does not apply to either the Kelly property or the Church. (Def.'s Mot. at 11).

For the Kelly property, the United States raises several arguments to establish a lack of adjacency to the railroad corridor. First, the United States argues that the Kelly property is physically separated from the railroad by an intervening road ("Main Street"), illustrated below:



---

[3] A showing of property interest by the remaining Plaintiffs would render this causation ruling instructive.

7

(Def.'s Mot. at 14–16). Therefore, the United States argues that it is impossible for the Kelly property to be adjacent to the railroad unless Plaintiffs can prove that "they [also] own the land on which Main Street is located[.]" (*Id.* at 14–15).

Plaintiffs reject this argument and claiming the original valuation map shows that, in 1868, Main Street "terminated and curved" just short of the Kelly property, as illustrated below:



(Pls.' Reply. at 6, ECF No. 34 (indicating the Kelly property with a yellow star); Hr.'g Tr. at 15:18–20). Based on the valuation map, Plaintiffs argue that Main Street could not possibly intervene between the railroad and the Kelly property, and that it confirms Plaintiffs acquired "land on both sides of where modern-day Main Street now runs[.]" (Pls.' Reply. at 6–7).

Despite Plaintiffs' arguments to the contrary, the United States maintains that the Kelly Plaintiffs' focus on whether Main Street curved in 1868 distracts from the more important point—that a road existed at that time, even if its name later changed. (*Compare* Hr'g Tr. at 27:5–7 (Def.'s Counsel: "[W]hat matters here is that there was a road, not the name of said road."), *with* Hr'g Tr. at 29:18–21 (Pls.' Counsel: "[T]here is no road delineated in that area . . . that's just a part of the parcel moving forward and a part of the tracks.")). Furthermore, the parties utilized different versions of modern map overlays to support their respective positions. (*See* Pls.' Reply at 7; Def.'s Reply at 7, ECF No. 41). Clearly, the existence of an intervening road is a disputed fact in this case that cannot be definitively resolved from the evidence currently before the Court. These types of factual inquiries are plainly better suited for resolution at trial. *See Lowery*, 167 Fed. Cl. at 37.

Second, the United States argues that the deed by which the Kelly Plaintiffs acquired the property at 590 Main Street defines the boundaries as running "along the northernly lines of Main Street . . . which is the edge of the road nearest to the house on the Kelly [p]roperty." (Def.'s Mot. at 15 (citing Pls.' Mot. Ex. PP (John Kelly and Zoe Markwalter-Kelly Deed, dated

July 1, 2009 ("the Kelly Deed")), ECF No. 23-42)). The United States claims that this language clearly establishes that the Kelly property abuts Main Street. (*Id.*). To that end, the United States further highlights that the Kelly Deed specifically states that "TOGETHER with all right, title and interest, *if any*, of the party of the first part in and to any streets and roads abutting the above described premises *to the center lines thereof* . . . ." (*Id.* (quoting Pls.' Mot. Ex. PP) (emphasis in original)). On the other hand, Plaintiffs argue that the Kelly Deed is largely immaterial because it attempts to impose modern street layouts onto an 1868 condemnation. (Pls.' Reply at 8). Even if, as the United States suggests, the Court were to consider the language seemingly defining the property as running along the "northernly lines of Main Street[,]" this deed is dated "09/18/2009[,]" thus it is unclear what version of Main Street the deed contemplates. (*See* Pls.' Mot. Ex. PP). Again, these assertions raise factual issues that the Court is unable to resolve at this stage.

The United States' final argument requests that the Court again examine the 1868 valuation map and the condemnation proceedings description of the boundaries. (Def.'s Mot. at 17 (citing Pls.' Mot. Ex. J and Def.'s Mot. Ex. 3)). As previously discussed, the 1868 valuation map's implications remain a disputed issue requiring further factual development. Additionally, the condemnation proceedings document accompanies the valuation map and describes the boundaries of the condemnation. (Def.'s Mot. at 17; Pls.' Reply at 7–8). However, this document presents its own unique issues, namely that significant portions of it are largely illegible. (*See* Def.'s Mot. Ex. 3). The Court asked, and the United States confirmed, that the Parties have not reached any agreement regarding the proper translation of this document. (Hr.'g Tr. at 24:23–25:1 (The Court: "[D]o you all have an agreement about what this document, how it translates into modern prose?" Def.'s Counsel: "I don't believe so.")). This document does little more than present



Example of Def.'s Mot. Ex. 3

additional questions that the Court is not postured to resolve on summary judgment. (Hr.'g Tr. at 24:18–20 (The Court: "[U]nless the Plaintiff agrees with you that your translation is correct, I can't make a determination from this document.")). Because there are genuine issues of material fact regarding the Kelly property's adjacency to the railroad and ownership interest, the Court cannot find summary judgment for either party at this time.

Turning now to the Church property, there is no dispute regarding the Church's adjacency to MNR's property. (Def.'s Mot. at 19). Instead, the United States disputes the nature of MNR's ownership, asserting that the land was acquired in fee, instead of an easement for railroad purposes. (*Id.*). The United States bases this argument on the theory that the railroad acquired the land for "rail depot purposes[,]" and that land acquired by a railroad for depot purposes is necessarily acquired in fee under New York law. (*Id.* at 19–21). The natural question following such an assertion is how does one know for certain that the railroad did in fact acquire the land for depot purposes? The United States asserts that this can determined by three factors:

9

(1) the rail corridor's irregular shape; (2) the proximity of the rail corridor to a rail depot; and (3) language in the condemnation proceedings. (*Id.* at 21).

First, the United States claims the rail corridor is irregular because it "bulges approximately [thirty] feet from the width of the rest of the corridor." (Def.'s Mot. at 21).

 

Figure 2a                    Figure 2b

(*Id.* at 21–22 (including image 2a as depicting the "bulge" in question.). The United States asserts that, because other portions of the rail line do not contain a similar bulge, this supports the conclusion that the "extra land" was acquired for depot purposes. (*Id.*). The Court is not persuaded by this reasoning. Based on the evidence currently before the Court, there is no clear standard for what constitutes a "regular" versus "irregular" shape in the context of a rail corridor. While the images provided may depict a "bulge," they represent only a small segment of a rail line that extends over forty miles. The Court also notes that similar protrusions—such as the one shown—may occur throughout the line and may simply reflect the established property boundaries, rather than serving as evidence of a depot or other special use. Accordingly, the Court is not convinced, on these facts alone, that the images demonstrate the land is irregularly shaped—let alone that the land was acquired in fee.

Next, the United States argues that the land originally acquired by the railroad, within the vicinity of the Church property, was used for a depot. (Def.'s Mot. 23). The United States bases much of this argument on the existence of a building known as the Matteawan Railroad Station Depot. (*Id.*). This building, of which the United States provides several historical photographs, supposedly constitutes proof that the land was condemned for rail depot purposes. (*Id.* at 22–23 (Def.'s Mot. Ex. 6, ECF No. 30-6)). The United States goes on to claim that the valuation map shows the Church property was "less than 50 feet" from Matteawan Railroad Station, which supports their conclusion that the railroad "condemned all of this additional land outside of the strip where its rail line was located for rail depot and related infrastructure purposes." (*Id.* at 23–24).



Matteawan Railroad Station Depot
(Def.'s Ex. 6, ECF No. 30-6)

10

The United States provided the following images to "depict the Church outlined in yellow and Matteawan Railroad Station Depot outlined in orange:"




Figure 3a                                      Figure 3b

(*Id.* at 24 (citing Pls.' Mot. Ex. O, ECF No. 23-15).

These assertions—like the irregularly shaped rail corridor theory—suffer from the same flaw: they ask the Court to accept the United States' claims as fact, despite credible evidence to the contrary. While the photographs of the Matteawan Railroad Station Depot confirm that the building existed, the Court does not agree that its mere presence proves the surrounding land was condemned for depot purposes. Furthermore, the United States' suggestion that the Church's proximity to the depot necessarily means all adjacent land was condemned for depot use is a stretch. In fact, Plaintiffs point out that the very valuation map relied upon by the United States identifies "the depot and its supporting infrastructure" as parcels of land separate from that of the Church. (Pls.' Reply at 9). Plaintiffs also point out that the valuation map indicates that the Church property was acquired through condemnation, while the depot and surrounding land were acquired by quitclaim deed—almost a decade and a half later. (*See* Pls.' Reply at 9 (citing Pls.' Mot. Ex. O)). Plaintiffs' objections raise additional unanswered questions that necessarily preclude summary judgment in this regard for either party.

Finally on this prong, the United States encourages the Court to observe other surrounding buildings as historical evidence in support of its theory, to include what it claims are four cement silos to the south of the property. (*Id.* (citing Def.'s Ex. 8, ECF No. 30-8)). The United States' argument that surrounding buildings support a finding that the land was condemned for depot purposes is unconvincing. In its briefing, the United States represented that there were four silos located near the church. (*See* Def.'s Mot. at 24 ("[T]here are four large cement silos located . . . just south of the Church property.")). During a hearing on this matter, the United States presented aerial imagery and stated that there were only two silos reflected, in contradiction to their briefing:

> Def.'s Counsel: "[T]here are kind of two round circular cylinder-like structures. There's a structure with two kind of, almost looks like a blob."

11

> The Court: "Yes, blob is a good description."
>
> Def.'s Counsel: "Yes, sorry, I apologize. That is the coal silos."
>
> The Court: "I thought there were three."
>
> Def.'s Counsel: "No, there are two. Two coal silos."

(Hr.'g Tr. 34:20–35:2). Even still, the Court was unable to clearly identify the silos. (Hr.'g Tr. at 41:22–25 (The Court: "I can't tell from looking at the photographs, those may be silos, best described in the photographs as a blob, your original word.")). Plaintiffs objected, claiming the silos were constructed almost 70 years after the condemnation with the purpose of heating homes and businesses. (Hr.'s Tr. at 44:20–45:1). While the United States attempts to frame these issues as questions of law, significant questions of fact remain—factual conflicts that must be resolved before summary judgment can be granted.

      Finally, the United States argues that the condemnation proceedings do not contain any language indicating that the railroad acquired only a right-of-way in the rail corridor. (Def.'s Mot. at 25 (citing Pls.' Mot. Exs. P, ECF No. 23-16 and O)). However, like the Kelly property, the document cited by the United States contains a mixture of typed and handwritten text. (*See* Pls.' Mot. Ex. P). Much of the handwritten portion is difficult, if not impossible, to read. The parties have not indicated any agreement regarding the proper interpretation or translation of this document, and the Court declines to undertake that task on its own. In short, the illegibility of the document and the lack of consensus between the parties underscore that material factual disputes remain**.**



Figure 4

      The United States raises one final argument disputing ownership of the paved parking lot behind the Church. (Def.'s Mot. at 26). Based on certain images, the United States argues that the lot appears to be on MNR's land adjacent to the rail corridor, which precludes summary judgment in the Church Plaintiffs' favor. (*Id.* at 26 (providing overhead photo, Figure 4, showing the subject parking lot)). Additionally, the United States argues that Plaintiffs failed to produce a license, lease, or other written document authorizing them to utilize the paved area, and if no such document exists, the existence and use of the lot implies that if MNR acquired an easement to operate the rail corridor, that easement is not an exclusive use easement." (*Id.* at 26–27). In their Reply, Plaintiffs first argue that Figure 4 comes from county tax parcel data that also includes disclaimers stating the

information therein is not accurate for legal purposes. (Pls.' Reply at 10). Plaintiffs also attach a licensing agreement. (Pls.' Reply (citing Pls.' Reply Ex. AAA, ECF No. 34-1)). [4]

There is a clear disagreement regarding the accuracy of the information obtained from the county tax parcel data, this is problematic for the United States, as its argument relies primarily on this data. On the other hand, as the United States points out, the license produced by the Plaintiffs lacks indicia of a properly executed agreement. Neither Plaintiff nor the United States has provided proof of ownership such that there can be no genuine issue of material fact. The Court is unable to determine ownership of the lot. Ownership of the parking lot by the Church remains a disputed issue not amenable to resolution on summary judgment.

### III.    Conclusion

For the reasons stated above, the Court finds that Plaintiffs Bernhard R. Liegl, Irene Popova, and Galt Automotive Warehouse, Inc. have established both a property interest and causation. However, Plaintiffs John Kelly, Zoe Markwalter-Kelly, and the Spanish Pentecostal Church, The Tabernacles of Christ Beacon NY, Inc., have not proven a property interest and thus cannot establish causation. Therefore, Plaintiffs' Motion for Partial Summary Judgment, (ECF No. 23), is **GRANTED-IN-PART** and **DENIED-IN-PART**. Additionally, the United States' Cross-Motion, (ECF No. 30), is **DENIED**.

Recognizing that the two groups of Plaintiffs will be in different procedural postures, the Court hereby **ORDERS** the Parties to meet and confer, and to submit a Joint Status Report by **November 18, 2025**, outlining a proposed schedule for pretrial proceedings, including a site visit and trial.

**IT IS SO ORDERED.**

s/    David A. Tapp
DAVID A. TAPP, Judge

---

[4] The United States disputes the authenticity of this license, pointing out that it is neither signed, dated, nor notarized and therefore unexecuted. (Def.'s Reply at 12–13, ECF No. 41). The United States also argues that the purported license weakens the Church's ownership claims because if the Church owned the lot in fee, a license would be unnecessary. (*Id.*). Allegedly, during depositions, the Church maintained it did not have a signed copy of the license. (*Id.*). Therefore, the United States believes the Church concedes it does not have title to the parking lot. (*Id.*).